IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEVEN RUSINOWSKI and JOSEPH
RUSINOWSKI,

            Plaintiffs,

        v.

VILLAGE OF HILLSIDE, a
Municipal Corporation, JOSEPH
LUKASZEK, ROBERT DiDOMENICO,
DAVID ANDRESKI, and ELMHURST
MEMORIAL HEALTHCARE,

            Defendants.

Case No. 11 C 4772

Hon. Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

Before the Court are four Motions for Summary Judgment and two Motions to Strike, all filed by Defendants.

**I.  BACKGROUND**

Plaintiff Steven Rusinowski ("Steven") is (or at least was) an active user of "BattleCam.com," a website where users broadcast themselves on camera and role-play with other users in aggressive, intimidating, and combative scenarios. On this website, users expect to see pranks, threats, and unusual behavior. Steven's online role-playing overflowed into real life, leading ultimately to this nine-count lawsuit against five defendants.

The principal events took place on and shortly after March 4, 2011, but relevant background goes back somewhat further. Steven is twenty-nine years old, enrolled in classes at Elmhurst College, and

lives with his father, Plaintiff Joseph Rusinowski, in Hillside, Illinois.  On November 11, 2010, Hillside Police arrived unannounced at the Rusinowski home based on a "concerned citizen" report from a caller who claimed that Steven was suicidal.  The Police entered the home and found Steven sleeping in his bedroom with no apparent suicidal thoughts.  Joseph Rusinowski later learned from Hillside Police Chief Joseph Lukaszek ("Chief Lukaszek") that Defendant Robert DiDomenico ("DiDomenico") was the anonymous caller, though DiDomenico disputes that he placed the call.

A few months later (the exact date is unclear), Elmhurst College security received a call stating that Steven was bringing weapons to and selling drugs on campus.  The College's security employees observed Steven on BattleCam.com and notified Elmhurst Police of their concerns about Steven.

This brings us to March 4, 2011.  Starting around midnight, Steven was on BattleCam.com with DiDomenico, a user with whom Steven was acquainted.  The two were online for more than eight hours straight.  Steven was displaying a handgun, making lewd comments about other users, and drinking beer – all of which seem par for the BattleCam.com course.  DiDomenico decided to call the Hillside Police – depending on whom you ask, DiDomenico was playing either a prank on Steven or concerned for Steven's safety and well-being.  DiDomenico spoke with Chief Lukaszek and told him that Steven could be seen on BattleCam.com drinking, waving loaded weapons, and threatening

himself and others.  Chief Lukaszek later testified that DiDomenico told him that Steven was suicidal.

In response to the call, Chief Lukaszek drove to the Rusinowski house in his police vehicle.  Once there, he stayed in his car and observed a live feed of Steven on BattleCam.com for 20-25 minutes. He saw Steven waving guns around, drinking, "acting obnoxious," and threatening someone named Alex who lives in North or South Carolina. Chief Lukaszek did not hear Steven threaten suicide, but based on the circumstances, Chief Lukaszek was concerned for the safety of Steven and others.

Chief Lukaszek called the Rusinowski house several times, but nobody answered.  He then approached the house and knocked on the front door.  Steven answered the door, but did not open it the entire way, apparently because the door sticks easily.  Chief Lukaszek could see only one of Steven's hands, so he asked Steven to show both hands.  Steven says that he complied with this order, but Chief Lukaszek contends that Steven refused eight commands to show both hands and responded with "why" and "but why" after each one. Lukaszek Dep. 87:13-88:14.  Chief Lukaszek may have ordered Steven to get on the ground, but the record is unclear.  The parties agree that, eventually, Chief Lukaszek grabbed Steven's arm and pulled him outside.  Steven fell forward and scraped his hand on the concrete, and then he was secured and taken to the Hillside Police Department. Hillside Police Officers then searched the Rusinowski house and recovered two handguns, one of which was loaded.  After spending some

time at the police department (the witnesses' estimates range from thirty minutes to two hours), Steven consented to being transported to Elmhurst Memorial Hospital.

Events at the Hospital are disputed. Defendants contend that Steven was examined by Defendant Dr. David Andreski ("Dr. Andreski"), but Steven insists that Dr. Andreski never examined him. Steven does not contest, however, that he was examined by Melissa Kroll, a clinician consultant, who concluded that Steven posed a danger to himself and others. Chief Lukaszek was called to the hospital, and once there he spoke with medical staff and filled out a petition to have Steven committed for mental health evaluation. Dr. Andreski signed a certificate that indicated that he had examined Steven and determined that Steven was a danger to himself or others. Steven was transferred to Madden Health, where he remained until March 10, 2011.

Steven testified that these events exacerbated his anxiety. In the wake of his involuntary commitment, he suffered from pain, anguish, difficulty sleeping, humiliation, and loss of appetite. He failed a midterm examination in one of his courses, and had to drop the class. Steven and his father brought this nine-count Amended Complaint, alleging a variety of federal and state claims, against Chief Lukaszek, the Village of Hillside, Robert DiDomenico, Dr. Andreski, and Elmhurst Memorial HealthCare. All Defendants have now moved for summary judgment, and have moved to strike portions of Plaintiffs' filings.

## II. MOTIONS TO STRIKE

Defendants have filed Motions to Strike that take issue with Plaintiffs' response to Defendants' statements of material facts.

In this District, a motion for summary judgment must be accompanied by a "statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(a)(3). The opposing party must respond to the movant's statement and support any disagreement with "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 56.1(b)(3)(B). Local Rule 56.1 is supposed to facilitate this Court's adjudication of summary judgment motions "by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012).

While some of Plaintiffs' answers comport with this requirement, others miss the mark completely. For example, the Village's Statement 32 asserts that DiDomenico told Chief Lukaszek that Steven had loaded weapons and was suicidal. Village of Hillside L.R. 56.1 Statement of Facts ("Village SOF") 32. The Village supports that statement with a citation to Chief Lukaszek's deposition, in which he testified that DiDomenico told him Steven threatened suicide. Lukaszek Dep. 308-09. As we will see, the content of DiDomenico's conversation with Chief Lukaszek is critical to whether Chief Lukaszek was justified in believing that Steven needed assistance because he was about to commit suicide.

Plaintiffs respond to Statement 32 not with any evidence that DiDomenico *did not* say that Steven was suicidal, but with the unhelpful declaration that "Plaintiff neither admits nor denies [statement 32] as Plaintiff lacks personal knowledge of what DiDomenico actually told the Hillside Police." Plaintiffs' L.R. 56.1 Statement of Facts ("Pl. SOF") 32. Of course Plaintiff lacks personal knowledge of the phone call – he was not a party to it. Plaintiff's response should have indicated what basis, if any, Plaintiff has to contest Chief Lukaszek's version of the phone call. If Plaintiff cannot marshal any evidence to show that DiDomenico did not tell Chief Lukaszek that Steven was suicidal, then the Court – whether on summary judgment or at trial – will have no choice but to rule on the basis of the evidence presented by the Village. In short, Plaintiff's non-response fails to show that there is a genuine factual dispute.

For many of Plaintiff's responses, Plaintiff has failed to provide evidence that controverts Defendant's statements. The Court need not, at this point, go through each contested paragraph to determine whether or not to strike it. Rather, the Court will address any insufficient statements when they arise in the summary judgment analysis. *Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.,* 196 F.Supp.2d 731, 737 (N.D. Ill. 2002). Therefore, the Motion to Strike is granted as discussed throughout the analysis, and denied without prejudice as to those paragraphs that do not arise in the summary judgment analysis.

### III.   MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009).

### A.   Fourth Amendment Search and Seizure – Count I

#### 1.  *Seizure*

Chief Lukaszek argues that he is entitled to summary judgment on the illegal seizure claim because he had probable cause.  The parties appear to agree that this issue should be governed by the familiar rule that a police officer has probable cause to arrest an individual when the facts and circumstances that are known to him support a reasonable belief that the individual has committed, is committing, or is about to be commit a crime.  *Holmes v. Village of Hoffman Estate,* 511 F.3d 673, 679 (7th Cir. 2007).  Chief Lukaszek argues that he had probable cause to think that Steven was about to commit suicide.

For this case, the problem with the regular probable cause test, and with Chief Lukaszek's proffered justification for the search and seizure, is that suicide is not a crime in Illinois.  *Royal Circle v. Achterrath,* 68 N.E. 492, 498 (Ill. 1903) (noting that "suicide is not a crime under the statutes of this state"); *People v. Peters,* 536

- 7 -

N.E.2d 465, 468 (Ill. App. Ct. 1989) (explaining that "suicide and attempted suicide are not crimes in this State"). The intrusion on Steven's Fourth Amendment rights cannot be supported by any fear that he was about to commit a crime.

This case is better analyzed under precedent that governs police responses to emergency situations. As the Supreme Court has explained, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006). Exigent circumstances can justify a warrantless search "where the police reasonably feared for the safety of someone inside the premises." *United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir. 1995). The officer must establish that the circumstances as they appeared at the moment of entry, viewed objectively, would have led "a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance." *United States v. Richardson,* 208 F.3d 626, 629 (7th Cir. 2000).

The Seventh Circuit addressed this issue recently in *Fitzgerald v. Santoro,* 707 F.3d 725 (7th Cir. 2013). In that case, the plaintiff called the police non-emergency number and spoke with the late-night desk officer. *Id.* at 728. The officer could tell that the plaintiff was intoxicated, and noted that she sounded very depressed and possibly suicidal. *Id.* Two officers and two paramedics were dispatched to the plaintiff's house, where they made

a forcible, warrantless entry. *Id.* That conduct did not violate the Fourth Amendment because "the officers had an objectively reasonable belief that they needed to enter without a warrant in order to prevent serious injury." *Id.* at 732.

It is uncontested that, during the early morning hours of March 4, 2011, Steven was on Battlecam.com and could be seen consuming alcohol and waving handguns. It is also uncontested that DiDomenico called the police. Chief Lukaszek testified that DiDomenico told him that Steven was suicidal. Village SOF 32. As discussed above, Plaintiff has failed to present evidence showing a genuine dispute as to paragraph 32, and thus Chief Lukaszek's testimony is deemed admitted. For the same reason, the Court considers it undisputed that Chief Lukaszek then, while in his police vehicle, viewed a live feed of Steven on Battlecam.com and confirmed that Steven was waving guns around and drinking. Village SOF 36. On these facts, it was objectively reasonable for Chief Lukaszek to believe that Steven was about to hurt himself and required immediate assistance.

It is important to note several facts that do not change the analysis. First, no material issue of fact is created by Steven's testimony that he never threatened to harm himself. This analysis turns on the facts known to the officer at the time of entry. Just as in *Fitzgerald,* where the plaintiff argued that she did not actually threaten suicide, the officer's actions are judged based on the information known to the officer at the time. *Fitzgerald,* 707 F.3d at 731.

Second, DiDomenico's hazy memory of what he said to the police does not create a genuine factual dispute because it does not contradict Chief Lakuszek's testimony. Plaintiffs have not directed the Court to any evidence that DiDomenico denies telling Chief Lakuszek that Steven was suicidal.

Third, Plaintiffs' challenge to Chief Lakuszek's credibility carries no weight on summary judgment, where the Court searches for genuine disputes as to material facts and does not assess the credibility of witnesses. *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008).

Fourth, while previous false reports that Steven was suicidal could have given the police department some cause for skepticism of this newest report, even Plaintiff concedes that "[t]he information provided by DiDomenico may have warranted a well-being check and further investigation." ECF No. 102 at 14.

Finally, it does not matter that Chief Lukaszek never observed Steven threaten suicide. Chief Lukaszek confirmed DiDomenico's reports that Steven was on Battlecam.com, drinking beer, and waving handguns; those corroborating facts entitled Chief Lukaszek to credit DiDomenico's report and fear that Steven was suicidal. *Illinois v. Gates,* 462 U.S. 213, 242 (1983) (explaining that "an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge").

Thus, the Court grants summary judgment in favor of Chief Lukaszek as to Fourth Amendment claims arising out of the seizure of Steven Rusinowski at the Rusinowski home.

## 2.  Search

Separate issues arise due to the fact that Village police searched the Rusinowski house after they secured Steven.  Chief Lukaszek argues that this search, during which the police recovered the weapons displayed on the webcam, was reasonable under the so-called "protective sweep exception."  As the Seventh Circuit explained recently, "a protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others." *United States v. Starnes,* --- F.3d ---, 2013 WL 6731784, *2 (7th Cir. 2013).  Incident to an arrest, officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie,* 494 U.S. 325, 334 (1990).  The search may extend beyond those immediately adjoining spaces when "articulable facts . . . would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

It is uncontested that Chief Lukaszek pulled Steven out of the house and then handcuffed him.  At that point, Chief Lukaszek and other officers had observed Steven drinking beer, waving around guns, and resisting police instructions to either show his hands or get on the ground.  Officers then conducted a short, limited searched of the

house to determine that the area was secure.  Chief Lukaszek went directly to the room where Steven displayed the handguns and seized the handguns in question, then searched the house to make sure there were no victims in the house and no other occupants to pose a threat to the officers.  There is no indication that the officers opened any cabinets or drawers or otherwise expanded the scope of the search. Even when the facts are viewed in the light most favorable to Steven, the search was permissible under the protective sweep exception.  *See also, Leaf v. Shelnutt,* 400 F.3d 1070, 1086 (explaining that a protective sweep can be reasonable to protect the safety of officers and potential victims of violence).  The Motion for Summary Judgment is granted as to Plaintiffs' Fourth Amendment search claim in Count I.

## B.  Excessive Force – Count II

Chief Lukaszek has moved for summary judgment as to Count II, in which Steven alleges that Chief Lukaszek used excessive force when arresting him.  This claim is analyzed under the Fourth Amendment's objective-reasonableness standard.  *Graham v. Connor,* 490 U.S. 386, 395 (1989).  The Court focuses its inquiry on the totality of the circumstances "to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing governmental interests."  *Cyrus v. Town of Mukwonago,* 624 F.3d 856, 861 (7th Cir. 2010).  Important factors include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect

is "actively resisting arrest or attempting to evade arrest by flight." *Id.*

The parties do not dispute that Chief Lukaszek knocked on the Rusinowskis' front door, and that Steven opened the inside wood door fully and the outside screen door halfway. At that point Chief Lukaszek instructed Steven to show both his hands. Chief Lukaszek testified in his deposition that Steven showed him only one hand and asked "why" and "but why" repeatedly. Lukaszek Dep. at 87-88. Steven testified that Chief Lukaszek and other officers asked him to get on the ground after he showed both hands. S. Rusinowski Dep. 444:7-9. It is undisputed that Chief Lukaszek then grabbed Steven's forearm and pulled him out of the doorway, at which point Steven fell down the front steps. Steven scraped his hand on the concrete outside his home.

As discussed above, suicide is not a crime in Illinois. Thus, the Court is unable to assess the "severity of the crime at issue." Viewing the facts in the light most favorable to the non-moving party, the Court must accept Steven's testimony that he showed both hands. But even with both hands showing, Steven could have had a gun hidden – the officers had just seen Steven on camera drinking and waving a gun around. So the officers proceeded cautiously and asked Steven to get to the ground. When Steven resisted, the officers grabbed Steven's arm and threw him to the ground. Even when these facts are viewed in the light most favorable to Steven, the Court sees no genuine dispute that the use of minimal force was justified

by the threat that Steven posed to officer safety and Steven's resistance to the instructions he was given by police.  As to Count II, Defendant's Motion for Summary Judgment is granted.

## C.  Battery – Count III

In Illinois, battery claims against police are limited by the principle that an arresting officer "generally may use any force reasonably necessary to effect an arrest." *People v. Sims,* 871 N.E.2d 153, 157 (Ill. App. Ct. 2007).  However, an officer has no right to use excessive force.  *Id.*  As explained above, Chief Lukaszek is entitled to summary judgment on Steven's excessive force claim.  Thus, Defendant's Motion for Summary Judgment is granted as to the battery claim as well.

## D.  Medical Negligence – Count IV

Under Illinois law, a plaintiff alleging medical malpractice must establish (1) the proper standard of care against which the defendant physician's conduct is measured, (2) an unskilled or negligent failure to comply with the applicable standard, (3) a resulting injury, and (4) proximately caused by the physician's want of skill or care.  *Sullivan v. Edward Hosp.,* 806 N.E.2d 645, 653 (Ill. 2004).

### 1.  *Against Dr. Andreski*

Steven argues that Dr. Andreski committed negligence *per se* by violating the Illinois Mental Health and Developmental Disabilities Code.  The Code provides for involuntary commitment of a psychiatric patient who, due to mental illness, is a danger to himself or others.

405 Ill. Comp. Stat. 5/3-601.  Involuntary commitment must be based on a petition that includes "[a] detailed statement of the reason for the assertion that the respondent is subject to involuntary admission on an inpatient basis."  *Id.*  The petition "shall be accompanied by a certificate executed by a physician" or other qualified individual that indicates that the physician "personally examined the respondent" and details "clinical observations . . . relied upon in reaching a diagnosis."  405 Ill. Comp. Stat. 5/3-602.

It is uncontested that Chief Lukaszek filled out the petition, and that Dr. Andreski completed the certificate.  Dr. Andreski testified that he examined Steven before completing the certificate.  Andreski Dep. 28:3-5.  Steven, however, insists that no such examination ever took place.  S. Rusinowski Dep. 372:23-373:1.  By affidavit, Steven states that he met Dr. Andreski for the first time when he took his grandmother to Elmhurst Memorial Hospital in October 2012.  S. Rusinowski Aff. ¶ 1, 3.  At that meeting, Steven did not think that Dr. Andreski recognized him.  *Id.* at ¶ 5, 7.

These competing positions are irreconcilable:  either the examination took place, or it did not.  They evidence a genuine dispute – on the evidence provided, a rational trier of fact could credit either version.  This issue is material because it bears directly on whether Dr. Andreski complied with the statute's requirement of a personal examination.

It does not matter that the evidence supporting Steven's position comes from his deposition and affidavits.  Defendants argue

that a plaintiff cannot rely on self-serving evidence to defeat summary judgment, but as explained recently by the Seventh Circuit, "the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013) (overruling *Albiero v. City of Kankakee,* 246 F.3d 927 (7th Cir. 2001)). As to this Count, the Motion for Summary Judgment is denied.

### 2. *Against Elmhurst Memorial HealthCare*

Steven's case against Elmhurst Memorial HealthCare ("Elmhurst" or "EMH") is premised on an agency relationship between EMH and Dr. Andreski. Steven has not argued that Dr. Andreski was EMH's employee, nor has he argued that Dr. Andreski was EMH's actual agent. Thus, he must rely on a theory of apparent agency.

In Illinois, a hospital may be liable vicariously for the medical or professional negligence of a non-employee treating physician if there is an apparent agency relationship between the hospital and the treating physician. *Gilbert v. Sycamore Mun. Hosp.,* 622 N.E.2d 788, 794 (Ill. 1993). In *Gilbert,* the Illinois Supreme Court set out three elements that a plaintiff must prove to establish apparent agency:

> (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of

- 16 -

> and acquiesced in them; and (3) the plaintiff
> acted in reliance upon the conduct of the
> hospital or its agent, consistent with ordinary
> care and prudence.

*Id.* at 795. The Court stressed that "[i]f a patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable." *Id.* at 794.

As an initial matter, Steven asserts that the Court should apply the borrowed servant doctrine of agency law. Steven cites to cases from Maryland that apply Maryland law. *See, e.g.*, *Rivera v. Prince George's County Health Dept.,* 649 A.2d 1212 (Md. App. 1994). But *Gilbert* is well-settled in Illinois, and Steven gives the Court no reason to think that an Illinois court would apply the borrowed servant principles from Maryland law. Thus, the Court's analysis will follow the framework established by Illinois courts in *Gilbert* and its progeny.

The parties do not dispute that, prior to March 4, 2011, Steven had been to the emergency room at Elmhurst Memorial Hospital on at least seven occasions. They agree that on six of these occasions, Steven signed consent forms that stated that:

> [t]he emergency room physician, pathologist and
> radiologist are not hospital, Elmhurst Clinic,
> or Elmhurst Memorial HealthCare employees. They
> are independent physician specialists providing
> specialized treatment.

Elmhurst SOF 32. Steven signed a similar form on the seventh visit. Steven concedes that, had he read the consent forms, he would have understood that the hospital did not employ the doctors. Steven

admits that no one at the hospital ever told him that the doctors were employed by the hospital.

The presence of this sort of disclaimer in a signed waiver, while not dispositive, is an important factor for courts to consider when determining whether the hospital acted in a manner that would lead a reasonable person to conclude that the doctor was an employee or agent of the hospital. *James v. Ingalls Mem'l Hosp.,* 701 N.E.2d 207, 210-11 (Ill. App. Ct. 1998). In one case, the plaintiff signed a consent form with a similar disclaimer, then later asserted that she believed the doctor was a hospital employee, but did not point to any specific actions the hospital took that led her to that conclusion. *Churkey v. Rustia,* 768 N.E.2d 842, 846-47 (Ill. App. Ct. 2002). The court granted summary judgment for the hospital on the apparent agency theory. *Id.*

Just like the *Churkey* plaintiff, Steven signed a waiver that explained that his doctors were not employed by the hospital. Steven points to no specific actions that the hospital took that reasonably would have given him the impression that Dr. Andreski was a hospital employee – again just as in *Churkey*. Accordingly, Elmhurst Memorial HealthCare is granted summary judgment on Steven's medical negligence claim.

### E. EMTALA – Count V

The federal Emergency Medical Treatment and Active Labor Act ("EMTALA") imposes two requirements on covered hospitals. First, they must "provide for an appropriate medical screening examination"

for those individuals who come to the hospital's emergency department and request treatment. 42 U.S.C. § 1395dd(a). Second, if the hospital determines that an individual has an emergency medical condition, the hospital must either treat the condition or arrange for the individual to be transferred to another medical facility. 42 U.S.C. § 1395dd(b)(1). Steven argues that EMH violated both of its duties under EMTALA.

### 1. *Screening Requirement*

The statute does not define what it means by "an appropriate medical screening examination." *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 879 (4th Cir. 1992). The Seventh Circuit has not addressed this issue. Other Circuits, however, agree that hospitals satisfy the screening requirement when they "apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients." *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 878 (4th Cir. 1992); *Marshall v. E. Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 322 (5th Cir. 1998) (examination is judged by "whether it was performed equitably in comparison to other patients with similar symptoms").

It is uncontested that Steven was evaluated by at least one nurse that Steven's blood alcohol content was measured, and that Steven was evaluated by a clinician to determine whether Steven required psychiatric hospitalization. However, the parties dispute, as discussed above, whether Dr. Andreski examined Steven. In his sworn testimony, Steven has indicated repeatedly that Dr. Andreski

never examined him. The Court must view this disputed fact in the light most favorable to Steven, the non-moving party.

It is reasonable to infer – given the hospital's insistence that its physician examined Steven – that the hospital's regular practice is for a physician to examine those patients presenting with symptoms similar to Steven's. If Steven can show that Dr. Andreski never examined him – and thus that Dr. Andreski's representations to the contrary were fabrications – then he should be able to show that the hospital treated him differently that it treats other patients presenting with similar symptoms. For this reason, the Court must infer that, if Steven's version of his treatment is proven at trial, Steven can also show that his treatment was not performed equitably in comparison to other patients with similar symptoms. Elmhurst cites no authority for its argument that a screening examination can be adequate even if it was not conducted by a physician. Thus, EMH's Motion for Summary Judgment is denied as to Steven's EMTALA screening claim.

### 2. *Stabilization and Transfer Requirements*

To succeed on a claim that a hospital failed to comply with EMTALA's stabilization and transfer requirements, a plaintiff must establish that the hospital detected an emergency medical condition, the patient was not stabilized before transfer, and the hospital neither obtained the patient's consent to transfer nor completed a certificate indicating the transfer would be beneficial to the patient and was appropriate. *Thomas v. Christ Hosp. and Med. Ctr.,*

328 F.3d 890, 893-94 (7th Cir. 2003); *Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir. 1994).  A hospital may not transfer the patient unless a physician:

> has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual.

42 U.S.C. § 1395dd(c)(1)(ii).

Steven has not provided evidence that the hospital detected an "emergency medical condition" as defined by the statute.  To the contrary, Steven argues throughout his filings that he never threatened to harm himself or others and did not even need to be in the hospital.  *See, e.g.,* ECF No. 159-1 at 3.

Plaintiff bears the burden of proving the elements of an EMTALA violation.  By pointing out the absence of evidence to support this claim, EMH placed the burden on Steven to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).  Because Steven has failed to present the Court with evidence to support a finding that he suffered from an emergency medical condition, there is no factual dispute for trial.  Thus, EMH's Motion for Summary Judgment is granted as to Steven's EMTALA stabilization and transfer claim.

### F.  False Imprisonment – Count VI

In Count VI, Steven alleges a state law claim for false imprisonment against Chief Lukaszek and Elmhurst.  To state a cause

of action for false imprisonment under Illinois law, "the plaintiff must allege that his personal liberty was unreasonably or unlawfully restrained against his will and that defendant(s) caused or procured the restraint." *Arthur v. Lutheran Gen. Hosp.,* 692 N.E.2d 1238, 1243 (Ill. App. Ct. 1998). Detention that is lawful pursuant to the provisions of Illinois law cannot be the basis of a false imprisonment claim. *Sassali v. DeFauw,* 696 N.E.2d 1217, 1218-19 (Ill. App. Ct. 1998). Illinois law allows a peace officer to:

> take a person into custody and transport him to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm.

405 Ill. Comp. Stat. 5/3-606.

Steven argues that there was no objectively reasonable justification for Chief Lukaszek's actions. But, as discussed above, Chief Lakuszek seized Steven lawfully when he thought that Steven required immediate assistance. Chief Lukaszek's actions were thus permissible under 405 Ill. Comp. Stat. 5/3-606, and cannot be the basis of a false imprisonment action. Against EMH, Steven relies on the same argument that he was never lawfully arrested by law enforcement. These arguments do not provide the Court with a basis to deny summary judgment.

In addition, Steven attempts to argue that the detention, even if initiated lawfully, became unlawful once Chief Lukaszek and Dr. Andreski signed false certifications. As to Chief Lukaszek, Steven

has not presented any evidence that the certification was false – as discussed above, Chief Lukaszek's testimony does not contradict DiDomenico's. And Dr. Andreski is not a Defendant as to this Count. Dr. Andreski's conduct cannot be attributed to Elmhurst because, as discussed in part III.D.2., Steven cannot rely on any agency theories to tie Dr. Andreski's conduct to the hospital. Thus, both Chief Lukaszek's and EMH's Motions for Summary Judgment are granted as to Count VI.

### G. Unlawful Detention – Count VII

In addition to the false imprisonment claim, Steven brings a federal claim for unlawful detention against Chief Lukaszek. As discussed above, Chief Lukaszek did not violate the Fourth Amendment when he seized Steven. Shortly thereafter, when asked by a Hillside officer if he wanted to go to Elmhurst Hospital, Steven responded that he wanted to go to the hospital. Within an hour or two of the seizure, Steven was taken to Elmhurst. Steven does not, at this point, contend that the detention at the police station was unreasonable.

Plaintiff argues that the detention was unlawful because Chief Lukaszek signed a false certification. His only support for that contention is his argument that some of Chief Lukaszek's testimony was contradictory. But on summary judgment, Plaintiff must do more than challenge a witness's credibility; he must show that there is a genuine dispute as to a material fact. *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008). Because he has not presented any

facts that show that the certification was false, the Court grants summary judgment for Chief Lukaszek on Count VII.

## H. Municipal Liability – Count VIII

In Count VIII, Plaintiffs bring a claim against the Village of Hillside under *Monell v. N.Y. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). *Monell* instructs that:

> [a] local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority.

*Id.* at 690. As discussed above, the Court grants summary judgment for Chief Lukaszek on all of Plaintiffs' constitutional claims, so Plaintiffs do not have any constitutional claims pending against Chief Lukaszek or the Village. But even if they did, the "policymaker" prong of *Monell* "requires more than the act of a policymaker." *McGreal v. Ostrov,* No. 98 C 3958, 2002 WL 1784461, *3 (N.D. Ill. Aug. 1, 2002). Municipal liability lies only where the policymaker's act "implement[s] . . . the government's policy." *Auriemma v. Rice,* 957 F.2d 397, 400 (7th Cir. 1992). Plaintiff has failed to produce any evidence that Chief Lukaszek's decisions to seize Steven in the manner that he did or search the house reflected the Village's policy. Because there is no genuine dispute of material fact, Defendant Village of Hillside is granted summary judgment as to Count VIII.

# I. Intentional Infliction of Emotional Distress – Count IX

Steven's final Count, brought against Defendant Robert DiDomenico, is for Intentional Infliction of Emotional Distress ("IIED"). In Illinois, a Plaintiff succeeds on an IIED claim by proving four elements: (1) extreme and outrageous conduct; (2) intent or recklessness to cause emotional distress; (3) severe or extreme emotional distress suffered by the plaintiff; and (4) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1030 (7th Cir. 2006) (citing *Pub. Fin. Corp. v. Davis,* 360 N.E.2d 765, 767–68 (1976).

## 1. *Extreme and Outrageous*

To determine whether conduct is extreme and outrageous, courts evaluate the conduct against an objective standard, based on all the facts and circumstances. *Graham v. Commonwealth Edison Co.,* 742 N.E.2d 858, 866 (Ill. App. Ct. 2000). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Id.* A defendant will be liable only for conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.*

It is undisputed that Steven and DiDomenico were acquainted through BattleCam.com, a website where users assume various identities and nicknames and engage in aberrant behavior. On November 11, 2010, Hillside Police visited the Rusinowski home based

on a report from a concerned citizen that Steven was suicidal. The police discovered Steven asleep in his bed, and determined that the call had been a prank and that Steven was not in any danger. It is also undisputed that on March 4, 2011, DiDomenico observed Steven's behavior on BattleCam.com before he contacted the Hillside Police Department and spoke to Chief Lukaszek.

Despite these points of agreement, the parties dispute a variety of facts related to Steven's IIED claim. Steven asserts that DiDomenico was the "concerned citizen" who called the police prior to their November 11, 2010 visit to the Rusinowski home. DiDomenico denies that accusation, but evidence in the record supports both sides. While there was no evidence to controvert Chief Lukaszek's testimony that DiDomenico told him that Steven was suicidal, the record reflects a dispute over whether that report was truthful. In addition, the parties disagree over whether DiDomenico was responsible for the call to Elmhurst College.

It is not necessarily extreme and outrageous to make a false police report. *Layne v. Builders Plumbing Supply Co.,* 569 N.E.2d 1104, 1108 (Ill. App. Ct. 1991). Nonetheless, disputed facts are viewed in the light most favorable to Steven indicate that DiDomenico perpetrated a campaign of harassment by calling in multiple false threats. A rational jury could understand that BattleCam.com is a roleplay website, where users expect unusual if not shocking conduct from other users, and still credit Steven's version of the facts.

When viewed in the light most favorable to the non-moving party, DiDomenico's conduct was extreme and outrageous.

## 2. Intent

On this element, important facts remain disputed. There is evidence in the record that DiDomenico may have been responsible for not only the March 4, 2011 call to the Hillside Police, but also the November 11, 2010 call to Hillside Police and various prank calls to Steven's school. DiDomenico concedes that he thought it was funny to call the police on Steven and have him sent to the hospital, but disputes that he laughed about the arrest when he spoke with Joseph Rusinowski. A reasonable jury could view these facts and determine that DiDomenico intended to inflict severe emotional harm on Steven, or at the very least acted recklessly with regard to whether his actions would inflict severe emotional harm on Steven.

## 3. Severe Emotional Distress

To support an IIED claim, the emotional distress must be "so severe that no reasonable man could be expected to endure it." *Kleidon v. Rizza Chevrolet, Inc.,* 527 N.E.2d 374, 377 (Ill. App. Ct. 1988). "The intensity and the duration of the distress are factors to be considered in determining its severity." *Id.*

The evidence shows that the March 4 incident exacerbated Steven's anxiety. Steven suffered from pain, anguish, difficulty sleeping, humiliation, and loss of appetite. He failed a midterm examination in one of his classes, and had to drop the class. A

reasonable jury could examine this evidence and determine that Steven suffered from severe emotional distress.

### 4. Causation

Finally, Steven must prove that DiDomenico's extreme and outrageous conduct was the actual and proximate cause of his distress. *Sornberger,* 434 F.3d at 1030. DiDomenico argues that Steven's distress was caused not by Defendant's phone call, but by Steven's failure to respond to lawful commands from police to come out of the house and show both hands. A reasonable jury could determine that DiDomenico called the Hillside Police only one time, and that Steven's actions cut off the chain of causation. However, a reasonable jury could conclude instead that DiDomenico was responsible for a pattern of harassment, and that Steven's emotional distress was a reasonably foreseeable consequence of DiDomenico's actions. Accordingly, DiDomenico's Motion for Summary Judgment is denied.

### V. CONCLUSION

For these reasons stated herein, the Court rules as follows:

1.   The Motions to Strike [ECF Nos. 168,174] are granted in part and denied in part;

2.   The Motion for Summary Judgment brought by the Village and Chief Lukaszek [ECF No. 102] is granted.

3.   The Motion for Summary Judgment brought by Elmhurst Memorial HealthCare [ECF No. 146] is granted in part and denied in part.

4.    The Motion for Summary Judgment brought by Dr. Andreski [ECF No. 128] is denied.

5.    The Motion for Summary Judgment brought by DiDomenico [ECF No. 143] is denied.

As a result of these rulings, summary judgment is granted in favor of Defendants on Count I, Count II, Count III, Count IV against Elmhurst Memorial HealthCare only, Count V for violations of the stabilization and transfer requirements only, Count VI, Count VII, and Count VIII.  Summary judgment is denied as to Count IV against Dr. Andreski only, Count V for the alleged violation of the screening requirement only, and Count IX.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

Date:2/6/2014